# 24-1970

## United States Court of Appeals
## for the Second Circuit



OUSSAMA EL OMARI,

*Plaintiff-Appellant,*

v.

DECHERT LLP, NICHOLAS PAUL DEL ROSSO,
VITAL MANAGEMENT SERVICES, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

MOORE INTERNATIONAL LAW PLLC
*Attorneys for Plaintiff-Appellant*
45 Rockefeller Plaza, Suite 2000
New York, New York 10111
(212) 332-3474
*mooresm@milpllc.com*



Dick Bailey Service INC
APPELLATE SERVICES
www.dickbailey.com

TABLE OF CONTENTS

Table of Authorities ................................................................................ iii

PRELIMINARY STATEMENT .......................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES ................................................................ 2

In this dismissed email hacking case involving post-litigation discovery
of Appellant El Omari's hacked attorney-client emails on a laptop owned
by the private investigator of his prior adversary's law firm in this district,

    I. Whether Judge Kaplan erred in not conducting a *de novo* review
    of El Omari's timely and specific objections to Magistrate Wang's
    Report and Recommendation to dismiss? ....................................... 2

    II. Whether Judge Kaplan erred in granting the Appellees'
    motions for dismissal and failed to grant leave to amend as to
    personal jurisdiction, statute of limitations, hacking and conspiracy
    to commit hacking under 18 U.S.C. § 1030(a)(2)(c), and
    conversion under North Carolina state law, when El Omari plead
    in detail, and it is not disputed that El Omari's attorney-client
    emails were discovered post-litigation on his adversary's laptop? ................. 2

STATEMENT OF THE CASE ............................................................... 2

    A.  Nature of the case ............................................................ 2

    B.  Course of proceedings and the disposition below ..................... 4

STATEMENT OF FACTS ................................................................... 4

STANDARD OF REVIEW ................................................................. 15

ARGUMENT ...........................................................................................16

I. In his one-page Order, Judge Kaplan erred in not conducting a
*de novo* review of El Omari's timely and specific objections to
Magistrate Wang's Report and Recommendation....................................16

II. Judge Kaplan erred in granting the Appellees' motions for dismissal
as to personal jurisdiction, statute of limitations, hacking and conspiracy
to commit hacking under 18 U.S.C. § 1030(a)(2)(c)), and conversion
under North Carolina state law, when El Omari plead in detail, and it is not
disputed that El Omari's attorney-client emails were discovered
post-litigation on his adversary's laptop...................................................19

A. There is personal jurisdiction over the Vital Defendants ..................21

B. The statute of limitations has not run................................................23

C. The hacking and conspiracy to commit hacking of El Omari's
confidential attorney-lient emails is properly plead under
18 U.S.C. § 1030(a)(2)(c) ......................................................................27

D. Conversion of El Omari's emails was properly plead within the 3-year
statute of limitations under North Carolina law.....................................39

E. El Omari should have been given an opportunity to amend the
complaint if necessary.............................................................................43

III. CONCLUSION.................................................................................43

IV. RELIEF ...........................................................................................43

CERTIFICATE OF COMPLIANCE.......................................................45

# TABLE OF AUTHORITIES

## **Cases**

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)......................................................................18

*Bridgetree, Inc. v. Red F Marketing LLC, et al*
No. 3:10-CV-00228 (W.D.N.C. Feb. 5, 2013) ............................42

*Chisum v. Campagna*
855 S.E.2d 173 (N.C. 2021) ........................................................41

*E.E.O.C. v. First Wireless Grp., Inc.*
225 F.R.D. 404 (E.D.N.Y. 2004)..................................................17

*Karedes v. Ackerley Group, Inc.*,
423 F.3d 107 (2d Cir. 2005) .........................................................15

*Mayor & City Council of Balt v. Citigroup, Inc.*
709 F.3d 129 (2d Cir. 2013) .........................................................19

*Piroleau v. Caserta*,
No. 10-cv-5670, 2012 WL 5389931..............................................17

*Sewell v. Bernardin*
795 F.3d 337 (2d Cir. 2015) .........................................................23

*TSC Research, LLC v. Bayer Chemicals Corp.*
552 F.Supp.2d 534 (M.D.N.C. 2008) ...........................................42

*Van Buren v. United States*
141 S. Ct. 1648 (2021)..................................................................32

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Services, LLC*
365 N.C. 520 (N.C. 2012) ............................................................41

*Vengalattore v. Cornell University*,
36 F.4th 87 (2d Cir. 2022) ............................................................19

*Whiteside v. Hover-Davis, Inc.*
 995 F.3d 315 (2d Cir. 2021) ...........................................................19

## <u>Federal Statutes</u>

18 U.S.C. § 1030(a) .........................................................................3, 5, 8
18 U.S.C. § 1030(a)(2)(C) .............................................................passim
18 U.S.C. § 1030(e)(8) ................................................................38, 39
18 U.S.C. § 1030(g) .........................................................................23
28 U.S.C. § 636(b)(1) .......................................................................17
28 U.S.C. § 1291 ...............................................................................1
28 U.S.C. § 1331 ...............................................................................1
28 U.S.C. § 1367 ...............................................................................1

## <u>Federal Rules</u>

Fed. R. Civ. P. 12(b)(6) ....................................................................18

Fed. R. Civ. P. 15(a)(2) ....................................................................43

Fed. R. Civ. P. 72 (b)(3) ...................................................................17

## <u>State Statutes</u>

NC § 1-52(4) ....................................................................................39

NY CPLR § 302(a)(1) .......................................................................21

## <u>Other Authorities</u>

2022 Meta Threat Report on the Surveillance-for-Hire Industry ..............9

## **PRELIMINARY STATEMENT**

Plaintiff-Appellant, Oussama El Omari, respectfully appeals from the Order of Dismissal of the Honorable Lewis A. Kaplan entered on June 24, 2024 (A-86), the Report and Recommendation of Magistrate Judge Ona T. Wang dated February 22, 2024, recommending the grant of the Defendants-Appellees, Nicholas Del Rosso, Vital Management Services, Inc., and Dechert LLP's, respective motions for dismissal (A-38), and the final judgment entered on June 25, 2024 (A-97), and each and every part therein.

## **JURISDICTIONAL STATEMENT**

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). Jurisdiction over state law claims was based on 28 U.S.C. § 1367 (supplemental jurisdiction). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. The final judgment was entered in the court below on June 25, 2024. (A-97) Appellants timely filed a notice of appeal on July 22, 2024. (A-98) This appeal is from the final judgment that disposes of all El Omari's claims.

## STATEMENT OF ISSUES

IN THIS DISMISSED EMAIL HACKING CASE INVOLVING POST-LITIGATION DISCOVERY OF APPELLANT EL OMARI'S HACKED ATTORNEY-CLIENT EMAILS ON A LAPTOP OWNED BY THE PRIVATE INVESTIGATOR OF HIS PRIOR ADVERSARY'S LAW FIRM IN THIS DISTRICT,

I. WHETHER JUDGE KAPLAN ERRED IN NOT CONDUCTING A *DE NOVO* REVIEW OF EL OMARI'S TIMELY AND SPECIFIC OBJECTIONS TO MAGISTRATE WANG'S REPORT AND RECOMMENDATION TO DISMISS?

II. WHETHER JUDGE KAPLAN ERRED IN GRANTING THE DEFENDANTS' MOTIONS FOR DISMISSAL AND NOT GRANTING LEAVE TO AMEND AS TO PERSONAL JURISDICTION, STATUTE OF LIMITATIONS, HACKING AND CONSPIRACY TO COMMIT HACKING UNDER 18 U.S.C. § 1030(A)(2)(C)), AND CONVERSION UNDER NORTH CAROLINA STATE LAW, WHEN EL OMARI PLEAD IN DETAIL, AND IT IS NOT DISPUTED THAT EL OMARI'S ATTORNEY-CLIENT EMAILS WERE DISCOVERED POST-LITIGATION ON HIS ADVERSARY'S LAPTOP?

## STATEMENT OF THE CASE

### A.    Nature of the case

On June 1, 2023, Plaintiff-Appellant, Oussama El Omari, filed a complaint and motion for preliminary injunction in the district court to preserve the *status quo* against Defendant-Appellee Dechert LLP, its private investigator Defendant-Appellee Nicholas Del Rosso, and Del Rosso's company, Defendant-Appellee Vital Management Services, Inc. El Omari alleged he learned in January 2023 from a notice in U.K. proceedings, of which El Omari was not a party, that his

2

attorney-client email communications were found in a hacked email tranche on a Laptop that had been transported from North Carolina to London, U.K. and was claimed to be owned by Del Rosso and Vital. El Omari alleged the stolen emails, dated during their prior litigation, were viewed, copied and used by the Appellees. El Omari alleged at least one of his email accounts was hacked, without his knowledge, beginning in 2017 by the Appellees during their previous litigation. El Omari alleged violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C), conspiracy to violate the CFAA, 18 U.S.C. § 1030(a), and conversion of his hacked emails in violation of North Carolina common law. O

On June 2, 2023, District Judge Lewis Kaplan referred all general pretrial and dispositive motions to Magistrate Judge Ona Wang.

On October 9, 2023, the same English court issued a written order directing Del Rosso and Vital, among other things, to prepare a report and extract the email tranche from the laptop and return it to El Omari's undersigned attorney. The email tranche was later extracted by their expert, Alvarez and Marsal, and returned, but the A&M report was not released under a claim of confidentiality.

Even with the Appellees not denying the stolen email tranche was found on the laptop, on February 22, 2024, Magistrate Wang issued a Report and Recommendation to grant their motions to dismiss.

On March 7, 2024, El Omari timely filed detailed objections to the Wang Report and Recommendation, and as alternative relief, requested an opportunity to amend the complaint to cure any deficiencies.

### B.    Course of proceedings and the disposition below

In his one-page decision, Judge Kaplan provided no rationale and did not address any of Appellant's objections or request for leave to amend. Judge Kaplan simply concluded, applying an incorrect standard, that Magistrate Wang's report and recommendation was not contrary to law and contained no clear error, and dismissed the case in its entirety. This appeal follows.

## <u>STATEMENT OF FACTS</u>

On June 1, 2023, Plaintiff-Appellant Oussama El Omari filed in the court below a complaint and motion for preliminary injunction against Defendant-Appellee Dechert LLP, ("Dechert"), its private investigator Defendant-Appellee Nicholas Del Rosso, ("Del Rosso"), and Del Rosso's company, Defendant-Appellee Vital Management Services, Inc., ("Vital"), (the latter two parties collectively referred to as "the Vital Appellees").[1] (ECF 1, 6) El Omari alleges he learned in January 2023 that at least one of his email accounts was hacked, without his knowledge, beginning in 2017 by the Appellees during their previous litigation

---

[1] On 8/22/2023, El Omari and Dechert resolved the motion for preliminary injunction as to Dechert by stipulation. (ECF 29)

4

in which they were adverse, and his confidential attorney-client email communications were viewed, copied and used against him.

El Omari alleges violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C), Compl. ¶¶ 47-55 (A-28-A31), conspiracy to violate the CFAA, 18 U.S.C. § 1030(a), Compl., ¶¶ 56-67 (A-31-A-34), and conversion of his hacked emails in violation of North Carolina common law. Compl., ¶¶ 68-75 (A-34-A-36). El Omari's motion for preliminary injunction was to preserve the status quo. El Omari sought assistance from the court to prevent the destruction and manipulation of El Omari's attorney-client email evidence, and wherever else that evidence may be found. This would include other copies in the Appellees' possession or control, since the stolen email tranche appeared to be a copy itself. El Omari alleges the Laptop was originally in North Carolina where the Vital Appellees are located, but was moved to London.

On June 2, 2023, Judge Kaplan referred all General Pretrial and Dispositive Motions in this case to Magistrate Judge Ona T. Wang. ECF 14. All subsequent proceedings and submissions were held before Magistrate Wang.

On September 7, 2023, El Omari filed a motion for a temporary restraining order. El Omari submitted he learned by English court filings that, after the filing of this case on June 1, 2023, and during briefing extensions sought by the Vital

Appellees, they had been busy working to upend its obligations in New York to preserve evidence.

On June 30, 2023, the Vital Appellees had filed a claim in English courts which would destroy the evidence of how the email tranche came to be on the Laptop. The Vital Appellees were asking the English court to order removal of the subject email tranche without first making a mirror image of the Laptop. ECF 42, 42-1. El Omari asserted that the removal of the email tranche would lead to spoliation because no mirror image was to be made prior to removal.

No action was taken by Magistrate Wang as to any of El Omari's requests for injunctive relief.

On October 9, 2023, the English court issued a written order, referencing the Vital Appellees' claim filed on June 30, 2023, accepting the manner requested by the Vital Appellees, directing, among other things, the extraction and return to the undersigned of the email tranche from the Laptop by the Vital Appellees' expert. ECF 63-1.

On February 9, 2024, the Vital Appellees' London attorneys served on the U.K. litigants their expert report prepared by Alvarez & Marsal, ("the A&M Report"). To date, the A&M Report has been requested, but not released to the undersigned due to the Vital Appellees' claim of confidentiality. The A&M Report was and is being guarded like the Crown Jewels, and is believed to contain critical

forensic information, including how the stolen email tranche came to be on the Laptop, whether and where off the Laptop other copies of El Omari's hacked emails exist, and whether other of El Omari's hacked emails exist on the Laptop.

On March 5, 2024, the undersigned received a letter from the Vital Defendants' UK attorneys, the London law firm Rosenblatt, confirming that A&M found what they termed the "Moore Data" on the Laptop. This letter stated "Alvarez & Marsal examined the Laptop and the Dedicated Media, during which they identified the Moore Data as being present." As of this date. the extraction and return of the "Moore Data" from the Laptop has occurred. The "Moore Data" which was on the Laptop is believed to itself be a copy, as alleged in the Complaint. However the location of any other copies are unknown.

On February 22, 2024, Magistrate Wang issued the Report and Recommendation to grant the Appellees' motions to dismiss. ECF 76 (A-38) The Report did not address El Omari's motions for temporary and preliminary injunctive relief.

El Omari timely filed his specific objections to the Report. ECF 77 (A-59)

In the Complaint, El Omari points out the prior litigation between the parties which coincides with the date range of the stolen email tranche of his attorney-

client communications found on Dechert's private investigator's Laptop.[2] Note the date range of this prior litigation. El Omari was plaintiff in Case number 16-CV-3895 and number 20-cv-2601 in this District. Case number 16-CV-3895 was filed on May 25, 2016, and its dismissal was upheld on appeal to the Second Circuit on August 23, 2018. Case number 20-CV-2601 was filed on March 27, 2020, and its dismissal was upheld on appeal on October 18, 2022. The undersigned counsel represented El Omari in both cases. Compl., ¶¶ 16-18. ECF 1 (A-15-A-16)

El Omari sought compensatory and punitive damages, and preliminary and permanent injunctive relief. Compl., Relief ¶¶ A-F. (A-36-A-37) Specific damages were also identified under individual counts.

Specific details of the alleged wrongdoing are plead. El Omari alleges: 1) On or about January 12, 2017, the Defendants accessed an email account of El Omari's (ceo@oussamaelomari.com), and obtained information, being attorney-client communication emails, in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C). Compl. ¶¶ 47-55 (A-28-A-31), 2) the Defendants conspired to commit an offense under 18 U.S.C. § 1030(a) by Del Rosso's private investigative company, Vital, paying an Indian company,

---

[2] El Omari is not alone as an alleged hacking target. According to an undercover investigation by the U.K. newspaper, *The Times*, "former Metropolitan Police officer Nick Del Rosso appears to have provided the [hacking] gang with the targets for at least 40 of the cyberattacks." *See* "Exposed: the global hacking network that targets VIPs", *The Sunday Times*, November 5, 2022 (https://www.thetimes.co.uk/article/exposed-the-global-hacking-network-that-targets-vips-nff67j67z)

CyberRoot Risk Advisory Private Limited, over $500,000 between July 2015 and December 2016, to send at least three phishing emails on December 20, 2016, January 3, 2017, and January 12, 2017, to two email accounts of El Omari (ceo@oussamaelomari.com and abousami2793@gmail.com), designed to steal his email account access credentials, one of which, contained a password stealing malicious attachment, Compl. ¶¶ 56-67(A-31-A-34), and 3) the Appellees converted his hacked emails in violation of North Carolina common law. Compl. ¶¶ 68-75 (A-34-A-36).

In December 2022, CyberRoot's hacking activities led to the company being publicly removed from Facebook and Instagram, and was publicly named and shamed. *See* 2022 Meta *Threat Report on the Surveillance-for-Hire Industry*, p. 8. CyberRoot's "network of more than 40 accounts on Facebook and Instagram" was removed. "[T]his group's activity manifested primarily in social engineering and phishing, often intended to trick people into giving up their credentials to various online accounts across the internet (e.g., email). This company used a very similar playbook as another surveillance-for-hire firm we removed in 2021 named BellTroX … This group often targeted people involved in litigation, likely on behalf of law firms." *Id*. at 9

The successful hack of El Omari's email account occurred after El Omari was tricked on January 12, 2017 into opening an email and its attachment, and

clicking on the first link in the attachment which took him to a malicious password stealing website. This is consistent with such a malicious website's capability of automatically downloading malware onto El Omari's computer with password stealing capability. Compl., ¶¶ 26-27 (A-20-A-21).

El Omari describes in his declaration supporting his motion for preliminary injunction how he was tricked by the January 12, 2017 email:

> I recall at the time opening the attachment titled "Adobe Summit EMEA 2016-Highlights" to the last email above, dated 1/12/2017, sent from ["Matt Rosen"] matt.rozen@ctfcomms.co to my Microsoft Outlook email account, ceo@oussamaelomari.com. I opened the email and its attachment believing it to be genuine because it appeared to be a speaking engagement invitation relating to a familiar free zones industry convention organizer trade group. I clicked on the first link at the top in the attachment to view information about the Summit invitation, and saw instead a screen of computer language I did not recognize. I stopped and clicked on the second link and saw a similar screen. I stopped and left the attachment. I did not know my login credentials would be stolen and my email account accessed. I did not authorize anyone else to access my email account. A copy of this 1/12/2017 email, and its malicious attachment, are attached here as Exhibits 1 and 2, respectively. These were analyzed as malicious in Tim Kiefer's report. El Omari Decl., ¶ 13(d) ECF 9.

The analysis by El Omari's forensic computer expert, Tim Kiefer, confirmed the malicious nature of this January 12, 2017 email:

> Analysis of the three suspected malicious emails suggests that the final email, received January 12, 2017 from ["Matt Rosen"] matt.rozen@ctfcomms.co, was a phishing email meant to trick Custodian [El Omari] into visiting a website other than what he would have expected after reviewing the information in the document 'Adobe Summit EMEA 2017.docx.' This is most commonly a tactic to present the user with an interface that seems legitimate to have

them enter sensitive personal information, such as usernames and passwords, or to bring the user to a page where malware is automatically downloaded and installed without the user's knowledge or consent. Information gathered through either method may than be used to gain unauthorized access to sensitive personal information, including login credentials.
Plaintiff's Forensic Computer Expert Witness Report, by Tim Kiefer, p. 6, annexed to the motion for preliminary injunction as Exhibit 1 to the Declaration of Tim Kiefer. ECF 10-1.

Kiefer explained that once access to an email account is established, emails can be copied and monitored:

"Once access has been established, and assuming the user does not notice, information such as emails can be exfiltrated over time, and continually monitored as new email is sent or received." (*Id*.)

The hacking scheme in this case is consistent with the "surveillance chain" in the "surveillance-for-hire industry" in which CyberRoot was banned by Meta. *See* Meta's 2022 *Threat Report* at 5. Here, 1) the "reconnaissance" of El Omari would show that El Omari has a searchable history of public speaking on free trade zones during his past tenure working for Ras Al Khaimah Free Trade Zone Authority, his previous employer in the U.A.E. 2) The "engagement" of El Omari began by the fake "Matt Rosen" original email invitation to El Omari to speak at a business convention and sent to El Omari's address, ceo@oussamaelomari.com, on January 3, 2017. Finally 3) the "exploitation" of El Omari occurred by the fake "Matt Rosen" follow-up email to El Omari's Microsoft Outlook email address, ceo@oussamaelomari.com, and copied to abousami2793@gmail.com, which

contained a malicious attachment with hidden links to a password stealing website. The password stealing website which El Omari was taken to by the link, "Internetv Security Standards. site," was created on the same date as the "Matt Rosen" January 12, 2017 email. Then "Internet Security Standards. site" was deleted on February 19, 2017. This short life span shows El Omari's email login credentials had been successfully stolen. See, Domain tools, Domain Report For Internet security standards. Site at 8 (2023), annexed as Exhibit 4 to the Moore Decl. in support of the motion for preliminary injunction. ECF 8-4.

Although the hacking occurred in 2017 during El Omari's New York litigation, the hacking was unknown at the time, and continued to be unknown until prompted by the surprise notice from the Appellees' U.K. litigation on January 13, 2023. Compl. ¶ 19 (A-17).[3] It is from the discovery of the fruits of the hacking, the stolen emails, on this date, January 13, 2023, that the hacking of his attorney-client emails had occurred. The U.K. notice disclosed that the email address of El

_____

[3] The court documents contained in the U.K. notice pertains to consolidated cases of *Al Sadeq v. Dechert LLP, Neil Gerrard, David Hughes, and Caroline Black*, Claim No. QB-2020-000322, *Stokoe Partnership Solicitors v. Dechert LLP David Neil Gerrard*, Claim No. QB-2020-002492, *Quzmar v. Dechert LLP and Neil Gerrard*, Claim No. QB-2020-003142, in the High Court of Justice, King's Bench Division. (collectively, "the U.K. litigation"). The court documents in the notice included: 1) an Order, dated 1/13/23, by Justice Murray providing for the notice, (annexed as Exhibit 5 to the Moore Declaration); a Witness Statement by U.K. Solicitor Haralambos Tsiattalou, (annexed as Exhibit 6 to the Moore Declaration); a Summary Report of Michael George, Diligence Int'l Ltd., January 12, 2023, ("the George Report"), (annexed as Exhibit 7 to the Moore Declaration); and a copy of extracts of transcript, (annexed as Exhibit 8 to the Moore Declaration). (collectively, "the U.K. notice"). ECF 8-5, 8-6, and 8-7.

Omari's undersigned counsel, "smm@milopc.com", was found in an unauthorized

email backup copy on the Laptop.

> We also identified a filed called 'smm@milopc.com as part of a
> update24Jan.rar'. This file appears to be a backup file of an email
> account. A 'Google' search of 'smm@milopc.com' indicates that it
> relates to a person named Mr Scott Michael Moore within a law firm
> called 'Moore International Law PLLC' based in New York.
> George Report ¶ 25. ECF 8-7.

The Laptop was then claimed to be owned by Dechert LLP's private

investigator, Nicholas Del Rosso. Compl. ¶ 19 (A-17).

> … a grey Huawei laptop… which belongs to me/VMS [Vital]….
> (Witness Statement of Nicholas Del Rosso ¶ 2.1, February 20, 2023)
> annexed as Exhibit 9 to the Moore Decl.)

> The Laptop belongs to VMS and was purchased by VMS on 25 March
2019….

> *Id*. at ¶ 17

In his quest in the U.K. litigation at that time to regain possession of his

Laptop, Del Rosso admitted to his employment by Dechert LLP.

> … all of the documentation and information upon it belongs to
> Dechert LLP or their clients which they had provided to me in the
> course of my instruction.
> (*Id.* at ¶ 27)

Del Rosso did not dispute the existence of the subject email tranche on his

Laptop, and had no explanation at that time.

> To the extent that the Laptop contains the material relating to Mr
> Moore or Moore International purportedly found by Diligence, it must
> have been put on the Laptop by someone other than me. (*Id*. ¶ 25).

13

Del Rosso's employer, Dechert LLP, had been adverse to El Omari in litigation in this District from May 2016 to October 2022, which is during the date range of the hacked emails. Compl. ¶¶17-18 (A-15-A-16).

The Laptop contained data ranging between March 2011 and May 2021. Compl. ¶ 20 (A-18). This was a period leading up to and following El Omari's termination in the U.A.E. in 2012 and during El Omari's previous litigation in this District which began in May 2016 and lasted until October 2022.

> Data on the device ranges between March 2011 and May 2021. George Report ¶ 20

Del Rosso also admitted the Laptop was moved from North Carolina to London in 2019. This time period was after the first case was concluded and prior to commencement of the second case in the NY litigation.

> After I bought the Laptop, it was initially kept in my home office in North Carolina, and from mid-2019 it was at my flat in London. Witness Statement of Nicholas Del Rosso ¶ 24, February 20, 2023. ECF 8-9

Besides the Laptop, a Huawei Matebook, two other devices were disclosed in the U.K. notice. The second device, an Aegis portable drive, *See* George Report, ¶ 12, was claimed to be owned by both Del Rosso and Dechert LLP, and was admitted to being moved from North Carolina to London in 2020. El Omari's second lawsuit in the NY Litigation was filed in 2020.

> The Aegis Drive belongs to VMS [here referred to as Vital] and was purchased by VMS on 3 February 2019…. After I bought the Aegis

14

Drive, it was kept at my home office in North Carolina, and from late January 2020 it was at my flat in London.
Witness Statement of Nicholas Del Rosso ¶ 26, February 20, 2023
…

Although the Aegis Drive is the property of VMS in that VMS purchased it, I believe that all of the documentation and information upon it belongs to Dechert LLP or their clients which they had provided to me in the course of my instruction. I had purchased the Aegis Drive specifically for this purpose."
*Id.* at ¶ 27. *See also* U.K. Order, Recital ¶ 5, February 3, 2023, annexed as Exhibit 10 to the Moore Decl. ECF 8-10

A third device, a Seagate portable drive (*see*, George Report, ¶ 5), was claimed to be owned by James E.D. Buchanan. *See* U.K. Order, Recital ¶ 6, February 2, 2023. Buchanan was also a defendant in El Omari's prior litigation in this District. Compl. ¶¶ 20-21 (A-18-A-19).

## **STANDARD OF REVIEW**

This Court reviews a district court's decision to grant a motion to dismiss *de novo*. *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)

# ARGUMENT

## I. IN HIS ONE PAGE ORDER, JUDGE KAPLAN ERRED IN NOT CONDUCTING A *DE NOVO* REVIEW OF EL OMARI'S TIMELY AND SPECIFIC OBJECTIONS TO MAGISTRATE WANG'S REPORT AND RECOMMENDATION.

On its face, Judge Kaplan's one page summary ruling did not conduct a *de novo* review of Magistrate Wang's Report. The dismissal document is titled as an "Order." Without citing a standard or any law, Judge Kaplan without any reasoning, simply concluded that, "Having reviewed the R&R and the parties' submissions setting forth and responding to plaintiff's objections, the Court perceives nothing contrary to law nor any clear error. Accordingly, the motions to dismiss (Dkt 34 and 36) are granted and the case dismissed." Order, at 1. (A-32)

However, El Omari made timely and specific objections to the Report, and Judge Kaplan was bound to review El Omari's objections *de novo,* but did not. Plaintiff's Objections. ECF 77 (A-59). See objections as to personal jurisdiction *(Id.* A-69-A-71), statute of limitations (*Id.* A-71-A-74), Counts One and Two: Hacking and Conspiracy to Commit Hacking (18 U.S.C. §1030(a)(2)(C)) (*Id*. A-74-A-82), Count Three: Conversion (*Id.* A-82-A-85), and Request to Amend the Complaint (*Id.* A-85).

Instead, the words in the Order show Judge Kaplan applied an erroneous higher and incorrect standard of clear error. A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part,

16

the findings or recommendations made by the magistrate judge." 28 U.S.C. §

636(b)(1). With respect to a magistrate judge's recommendations on a dispositive

motion, the Court reviews *de novo* those determinations as to which a party has

objected. *Id*. ("A judge of the court shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which

objection is made."); Fed. R. Civ. P. 72 (b)(3) ("The district judge must determine

*de novo* any part of the magistrate judge's disposition that has been properly

objected to.") However, "[t]o accept the report and recommendation of a

magistrate judge on a dispositive matter as to which no timely objection has been

made, the district judge need only be satisfied that there is no clear error on the fact

of the record." *Piroleau v. Caserta*, No. 10-cv-5670, 2012 WL 5389931, at *1

(E.D.N.Y. Oct. 29, 2012). "[A]n order is contrary to law when it fails to apply or

misapplies relevant statutes, case law or rules of procedure." *E.E.O.C. v. First

Wireless Grp., Inc*., 225 F.R.D. 404, 405 (E.D.N.Y. 2004). This latter and higher

standard did not apply because El Omari made timely and specific objections to all

parts of the Report.

 For these reasons, respectfully, Judge Kaplan's Order dismissing El Omari's

case applied the wrong higher standard and is erroneous on its face.

 As such, this Court is left to review the Report, and as El Omari points out

below, Magistrate Wang herself did not correctly apply the review standard to

which she was bound and substituted her own judgment, essentially rewriting El Omari's Complaint. To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows court to draw reasonable inference that the defendant is liable for the misconduct alleged," but such inference must be "more than a sheer possibility that a defendant acted unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 566). In other words, if the complaint only pleads facts that are "merely consistent" with a defendant's liability, then the complaint fails to meet the plausibility standard. *Id*. (citing *Twombly*, 550 U.S. at 557). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679. For a complaint to show that the plaintiff is entitled to relief, the well-pleaded facts must allow a court "to infer more than the mere possibility of misconduct." *Id*. Determining whether a claim is facially plausible is a "context-specific task," and a court must "draw on its judicial experience and common sense." *Id*. at 679.

In evaluating a motion to dismiss for failure to state a claim, a court undertakes a two-pronged approach: "(1) identify pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth; and (2)

determine whether the remaining well-pleaded factual allegations, assumed to be true, plausibly give rise to an entitlement to relief." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021). The court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine while ruling on a motion for failure to state a claim, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Vengalattore v. Cornell University*, 36 F.4th 87, 102 (2d Cir. 2022) (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021)). The court must "accept all factual allegations as true and draw every reasonable inference from those facts in the plaintiff's favor." *Mayor & City Council of Balt v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013).

As shown below, Magistrate Wang in her Report, and Judge Kaplan in his Order, did not read the Complaint plainly or in a light most favorable to El Omari.

## II. JUDGE KAPLAN ERRED IN GRANTING THE APPELLEES' MOTIONS FOR DISMISSAL AS TO PERSONAL JURISDICTION, STATUTE OF LIMITATIONS, HACKING AND CONSPIRACY TO COMMIT HACKING UNDER 18 U.S.C. § 1030(A)(2)(C)), AND CONVERSION UNDER NORTH CAROLINA STATE LAW, WHEN EL OMARI PLEAD IN DETAIL, AND IT IS NOT DISPUTED THAT EL OMARI'S ATTORNEY-CLIENT EMAILS WERE DISCOVERED POST-LITIGATION ON HIS ADVERSARY'S LAPTOP.

Magistrate Wang rewrote the Complaint. El Omari plead "[t]hese [hacked] law emails would contain confidential information, such as El Omari's legal strategy, witnesses, evidence, and funding about the NY litigation defended by

Dechert LLC." Compl., ¶ 30 (A-21-A-22) In this case, the complaint alleges the Defendants had El Omari's attorney-client email communications during the entire time they were adverse in litigation with El Omari in New York, from 2016 to 2021. "The data on the Laptop, determined to be between March 2011 and May 2021, is during the period leading up to El Omari's RAKFTZA employment termination in 2012 and subsequent NY litigation from 2016 onward. Compl., ¶ 20 (A-18)

But Magistrate Wang did not accept this as true, and understated the nature, timing, and harm of the hacking of attorney-client communications. "At best, Plaintiff alleges, with zero factual support, that the hacked emails were 'used by' Dechert's New York lawyers in *El Omari I*. Compl. ¶ 39 (A-26) But this also cannot be possible, because *El Omari I* was dismissed at the pleading stage." Report, p. 9 (A-19). But the stage of the prior litigation is not relevant. The fact of the timing; the hacking occurred during the prior litigation is key.

Magistrate Wang also did not review the complaint for what it is: pleading a new hacking case with new causes of action. Instead, Magistrate Wang continued throughout the Report to refer to the prior litigation between the parties as if the complaint was an amended complaint from prior litigation, which it is not.

## A. THERE IS PERSONAL JURISDICTION OVER THE VITAL DEFENDANTS

Magistrate Wang erred in finding a lack of personal jurisdiction over the Vital Appellees by not correctly applying NY CPLR § 302(a)(1). Report, p. 8 (A-45). Magistrate Wang cited no case law and was mistaken in finding that "[t]he allegations in the Complaint do not satisfy either the 'transacting business' or 'tortious act' part of the statute…. There is no pleading that either a business transaction giving rise to the injury or a tort was committed by Del Rosso in New York." Report, p. 9 (A-46). Magistrate Wang did not apply the "contracts" language of the statute at all, misapplied the "transactions" language, and did not consider the plain language of the documents incorporated into the complaint by reference, such as Del Rosso's UK testimony. Magistrate Wang further did not consider the plain language of Del Rosso's testimony. Report, p. 9, fn 15 (A-46).

El Omari asserted jurisdiction under § 302(a)(1) ("Transacts any business within the state or contracts anywhere to supply goods or services in the state"). See Plaintiff's Amended Consolidated Memorandum of Law in Opposition to Defendants Del Rosso and Vital's Motion to Dismiss and Reply in Support of Motion for Preliminary Injunction, p. 5. (ECF 56) ("Pls MOL") The court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine while ruling on a motion for failure to state a claim, in particular,

documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Vengalattore*, 36 F.4th, at 102. Pls MOL, p. 2.

The Complaint plead "[j]urisdiction is proper over Del Rosso because as Dechert LLP's private investigator, he is an agent of Dechert LLP. Del Rosso directed the hacking of El Omari through CyberRoot, the hacking agent in India, and reported the resulting illegal intelligence for use against El Omari in this District. Upon information and belief, Del Rosso made numerous trips to New York for personal meetings as part of his wrongful activities." Compl., ¶ 14 (A-15)

El Omari pointed out there are two specific facts adding to the complaint allegations that point to Del Rosso's business activity in the State of New York. First, Defendant Del Rosso testified at the London trial in *Azima*, in correcting his witness statement, that on the "date I first delivered a secure drive" (Trial Testimony of Nicholas Del Rosso, Jan. 30, 2020, Day 7, 54, ln. 16, annexed as Exhibit 1 to the Declaration of Scott M. Moore, Sep. 22, 2023), "I was flying to New York." (*Id*. at ln. 19) Magistrate Wang did not appreciate the importance of this testimony. Del Rosso claimed ownership of the Laptop found to contain El Omari's hacked emails. Del Rosso traveled to New York to deliver a secure drive, during the same period he admitted he was engaged as Dechert's private investigator. All occurring during the same period Dechert was engaged in litigation with El Omari.

22

Who else would Del Rosso be delivering a secure drive to but transacting business with and providing services to Dechert's New York office, and as part of their contractual relationship? All were part of Del Rosso's "massive investigation" in Del Rosso's own words. See Pls MOL, pp. 5-7. Magistrate Wang put "massive investigation" in quotes, seeming to suggest it was an exaggeration by El Omari. Magistrate Wang did not recognize it was Del Rosso's own words from his London testimony. Report, 9 (A-46).

**B. THE STATUTE OF LIMITATIONS HAS NOT RUN**

Magistrate Wang erred in finding that El Omari's CFAA claims are barred by the 2-year statutes of limitations under 18 USC § 1030(g). She misapplied the discovery of damage element of the statute of limitations and the case of *Sewell v. Bernardin*, 795 F.3d 337 (2d Cir. 2015). Magistrate Wang further factually confused the date of El Omari's discovery of the damage - which was January of 2023 when he received a notice his confidential attorney emails had been found on an adversary's computer - rather than the date of the email hack, January 2017. Report, pp. 11-12 (A-48-A-49)

*Sewell* is distinguishable on the facts. In application of *Sewell*, Magistrate Wang notes "The Second Circuit found that the two-year statute of limitations began to run from the date she discovered – for each account — that she could no longer access her accounts." Report, p. 10 (A-47) "Here, Plaintiff discovered the

23

intrusion in January 2017, as soon as he clicked on the link." Report, p. 12 (A-49) But here, there are no similar facts that El Omari could not access his email accounts in 2017 which would clearly indicate a disabling hack.

Magistrate Wang also confused the facts and misapplies the law in her finding that "Nor is it plausible to find that the "discovery of the damage" occurred when Plaintiff received the UK Notice in 2023, or after he conducted an investigation after receiving the UK Notice." Report, p. 12 (A-49).

Magistrate Wang erroneously reasoned it was not plausible because she improperly imposed on El Omari a duty to find hacking where he did not know it existed, and imputed a high level of hacking knowledge and sophistication by a victim not required under the statute. Magistrate Wang implies that El Omari should have discovered the email hacking in 2017, even though in fact he did not. "[I]in his proposed Third Amended Complaint in El Omari I, Plaintiff claimed that his "computer expert" had created a document dated January 25, 2017, that indicated that his personal website had been hacked in 2014. (El Omari I, ECF 121-1 at ¶¶ 84-93)." Report, p. 12 (A-49) However, this document, from an earlier case, and not discussed in the briefing here, was completely unrelated in manner, time and place; it related to a 2014 hack of a website hosted in Canada, completely unrelated to the future 2017 U.S. email hacking. The statute creates a cause of

action for each illegal hack. It does not deprive a victim of causes of action for future hacks after one occurs.

Even if Magistrate Wang is correct that the damage discovery date was imputed to be in 2017, which is wrong, she erred because she did not consider the date range of the stolen emails occurring within the statute of limitations. The portion of the hacked email tranche on Del Rosso's Laptop dated afterwards are not barred, because El Omari could not have discovered the damage of the theft of future emails. The complaint alleges the stolen email tranche found on Del Rosso's Laptop ranged in date from March 2011 to May 2021. "The data on the Laptop, determined to be between March 2011 and May 2021, is during the period leading up to El Omari's RAKFTZA employment termination in 2012 and subsequent NY litigation from 2016 onward." Compl. ¶ 20 (A-18) As such, the damage by the theft of emails dated after the January 2017 hack was not and could not have been discovered until the January 2023 notice, and the statute of limitations does not bar a claim for that portion of the stolen emails.

Magistrate Wang reasoning is narrow and erroneous, that "to find otherwise would nullify the limitations period in 18 USC § 1030(g), encourage a willful ignorance of phishing and other hacking techniques, and reward a lack of basic cyber security awareness." Report, p. 13 (A-50). There is nothing in the statute to support Magistrate Wang's imposition of this anti-victim duty. Nor does a plain

reading of the complaint support Magistrate Wang's language of "willful ignorance" or "lack of basic cyber security awareness" on the part of El Omari. To the contrary, the complaint shows that El Omari has been unfairly undermined from the start by the clandestine intelligence gathering of the Appellees which made his attorney-client communications transparent to them. The object of the CFAA, a criminal law, is to protect victims like El Omari, and hold perpetrators accountable.

Magistrate Wang was also mistaken in application of equitable estoppel to the Defendants' assertion of a statute of limitations defense to El Omari's conversion claim, and finding they were not estopped. Report, p. 13, fn. 19 (A-50) "Plaintiff has not pleaded conduct, intent, or knowledge of the real facts." *Id*. But the "real facts" are plead. The stolen email tranche, a smoking gun, was found on Del Rosso's Laptop, in and of itself a private storage device not open to El Omari or the public.. El Omari pointed out the facts in the complaint establishing equitable estoppel. "First, the Defendants hacked into El Omari's email accounts during the NY litigation in 2017, unbeknownst to El Omari, and converted El Omari's email communications for their use. Compl. ¶ 69 (A-34-A-35) Such secretive conduct undermines basic fair play in litigation. The Defendants falsely represented themselves as being fairly involved in the NY litigation, in the sense of being officers of the court with all the duties and obligations of fair play that

entails. Also, the Defendants attempted to hide their hacking efforts by urging CyberRoot to prepare false invoices, which further shows that the Defendants concealed their conduct during the NY litigation. *Id*. at ¶ 35 (A-24) Thus, the Defendants' secret conversion amounts to a false representation or concealment of material facts.

The fact that the Appellees hacked into El Omari's email accounts during their litigation, and concealed their hacking efforts on a private Laptop moved out of the United States, strongly suggests their intention to convert El Omari's emails.

Lastly, the Appellees had sufficient knowledge about the hacking, for they were caught red-handed with the stolen emails, and hired and paid over a half-million dollars to a known hacker, CyberRoot. Compl. ¶¶ 32-34 (A-22-A-24)

Therefore, the requirements for equitable estoppel are met. Pls. MOL, pp.14-15.

## C. THE HACKING AND CONSPIRACY TO COMMIT HACKING OF EL OMARI'S CONFIDENTIAL ATTORNEY-CLIENT EMAILS IS PROPERLY PLEAD UNDER 18 U.S.C. § 1030(A)(2)(C)

### Counts One and Two: Hacking and Conspiracy to Commit Hacking (18 U.S.C. § 1030(a)(2)(C))

Magistrate Wang misapplied 18 U.S.C. § 1030(a)(2)(C) to the facts in the complaint, mistakenly finding "[w]hile he provides more detail this time [referring to prior litigation], the allegations are still insufficient." Report, p. 15 (A-52) Another example that Magistrate Wang rewrote the complaint.

First, Magistrate Wang correctly found sufficiency in the complaint that El Omari was hacked within the meaning of the statute. "Plaintiff alleges sufficient facts that he was hacked by someone." Report, p. 16 (A-53)

But then Magistrate Wang erroneously transfixed the plain language of the complaint into a who dunnit mystery. "Although there is more detail about the hack itself, Plaintiff still does not plead facts to establish that Defendants – as opposed to someone else – hacked or conspired to hack his emails." Report, p. 17 (A-54). "While Plaintiff pleads Defendant Vital sent over $500,000 in wire transfers to an organization in India called CyberRoot in 2015 and 2016 (Compl. ¶ 33), the rest of the allegations attempting to link Defendants to the hacking are conclusory and made "upon information and belief." Report, p. 17 (A-54)

This ignores the facts, the half-million dollars paid to a known hacker and the smoking gun – the stolen emails spanning their entire litigation history found on the Laptop of Dechert's private investigator. There is no mystery here.

Another confusion is that Magistrate Wang misunderstood or downplayed El Omari's submission relating to the leak, during this action, of hacking materials in ECF 57-6 by KB, an anonymous person, which occurred after Plaintiff filed his original brief early before the deadline. See ECF 56. Report, p. 17, fn. 23[4] (A-54)

---

[4] Magistrate Wang referred to the first KB leak as "heavily redacted," but with leave El Omari filed the leak in a less redacted form. See ECF 64, and 64-1 to 64-7.

Magistrate Wang wondered why El Omari was "sharing" the leak with the Court, regarding the pending motions, and erroneously took this anonymous leak as showing "someone else" hacked Plaintiff rather than the Defendants. *Id*. But Plaintiff pointed out "[t]his evidence anonymously disclosed today… shows 1) the hacking in this case was more widespread than known by Plaintiff and the undersigned, 2) the importance of preservation of emails on the Laptop, and 3) there are multiple copies of the hacked emails." Decl. of Scott M. Moore, 9/25/2023, ¶ 4. (ECF 57) The manner in which KB leaked the materials specifically to attorneys for the Defendants, as well as Plaintiff, strongly suggests a possible motive of an out-of-control CyberRoot dangling its own hacking evidence in an attempt to shakedown the Defendants. "The sender copied said email to email addresses of opposing counsel in this case, as well as other counsel of record in other cases involving the Vital Defendants." *Id*., ¶ 3.

There is no mystery in the complaint. El Omari plead the discovery of Del Rosso's Laptop containing the stolen emails, the dates of the stolen emails match his prior litigation, the discovery of El Omari's hacking and those hacking dates, and the money trail.

There is no mystery in the complaint. El Omari plead the discovery of Del Rosso's Laptop containing the stolen emails, the dates of the stolen emails match his prior litigation, the discovery of El Omari's hacking and those hacking dates, and the money trail.

None of this was known, or could have been known, until after January 2023 when two key events occured: 1) The U.K. notice of the fruits, the stolen emails tranche, discovered on Del Rosso's Laptop, and 2) A subsequent credible and

specific tip of how to find evidence of the hacking - A major investigative news journalist came forward who contended contact with an involved hacker, and provided El Omari with information about the hacker's email header information (to, from, date, subject) so El Omari could search and find the hacker's emails to El Omari as described in the complaint.

"On January13, 2023, just months after the last case in the NY litigation was upheld on appeal, El Omari's undersigned counsel received a foreign notice pursuant to a U.K. court order, concerning disclosure in London of the discovery of three data storage devices. ("the U.K. notice"). …One device, a laptop, was found to contain a backup copy of emails containing the email address of El Omari's undersigned counsel (smm@milopc.com). This disclosure did not include the email contents or identify any sender or recipient addresses. The evidence shows to be communications between El Omari and his undersigned attorney." Compl., ¶ 19 (A-17) "The data on the Laptop, determined to be between March 2011 and May 2021, is during the period leading up to El Omari's RAKFTZA employment termination in 2012 and subsequent NY litigation from 2016 onward." Compl., ¶ 20 (A-18) "Del Rosso asserted a claim of ownership of the Laptop in the U.K. litigation. Del Rosso has admitted to being a private investigator employed by Dechert LLP since approximately August 2014. *Id*. "These law emails would contain confidential information, such as El Omari's

legal strategy, witnesses, evidence, and funding about the NY litigation defended by Dechert LLC." Compl., ¶ 30 (A-21-A-22)

As if the linkage details of the Laptop to the Appellees alone was not enough, and it is, El Omari provided other details of the Appellees to the hacking, and its fruits found on the Laptop. The plain language of the complaint alleging specific payments totaling over $500,000 by Dechert's private investigator to a publicly known hacking organization in India, CyberRoot, during the hacking period of Plaintiff's emails and their prior litigation period. See, Compl., ¶¶ 32-39 (A-22-A-26)

The only information and belief pleading, seized upon and overemphasized by Magistrate Wang, had to do with non-central allegations. "Del Rosso's hacking instructions and related communications with CyberRoot, upon information and belief, were in part through Jain, the Indian hacking ringleader. Upon information and belief, Jain's hacking database contains both of El Omari's email addresses. Jain's database is believed to also show that Del Rosso gave Jain over 40 hacking target names." Compl., ¶ 33 (A-22-A23) "Upon information and belief, Del Rosso paid further and other substantial payments to CyberRoot, Jain, and BellTrox, before and after the above period, and Del Rosso after the fact urged CyberRoot to prepare false invoices in an attempt to cover-up the true purpose of his hacking payments." Compl., ¶ 35 (A-24)

Magistrate Wang erroneously focused on the absence of this level of detail relating to how the CyberRoot organization works, without considering the larger picture involving the Laptop, to determine the entire claim was not plausible. Report, pp. 17-18 (A-54-A-55). Magistrate Wang imposed upon El Omari a requirement to essentially name operative names, the specific CyberRoot hacker who pushed the computer buttons for the money paid to CyberRoot. Plausibility does not require this level of detail at the pleading stage.

Magistrate Wang further erred in finding lack of details to establish damages greater than $5,000. Magistrate Wang erroneously considered the damages plead as "general," "conclusory," and "incoherent." She rewrote the complaint. Report, pp. 18-19 (A-55-A-56). Magistrate Wang misapplied *Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021) to the complaint in concluding "[t]hese are not compensable under the plain language of the statute and *Van Buren*." Report, pp. 19-20 (A-56-A-57).

The complaint's pleading of forensic computer investigation costs in excess of $5,000 alone is sufficient to establish a viable claim under the statute. At first, Magistrate Wang implied that El Omari's pleading of the costs of "forensic computer investigation" in excess of $5,000 at paragraph 41 of the complaint to be sufficient, but then failed to plainly read the complaint that such costs were specifically incurred for the computer investigation after January 2023.

Magistrate Wang did not accept the plain facts as true, and backed off, erroneously suggesting <u>a portion of those costs were really incurred in prior cases bringing the costs to a level below $5,000</u>. "It is also not clear whether all of Plaintiff's "forensic computer investigation costs" would be covered, since Plaintiff claimed in 2017, in *El Omari I*, that his personal website had been hacked in 2014, and claimed in *El Omari II* that he'd given five Skype interviews (and disclosed confidential information) in 2020 to someone who had posed as a reporter for Fox News." Report, p. 18, fn. 24 (A-55).

But the complaint is plain and clear. Here, the complaint plainly states the costs in this case were incurred <u>after January 2023</u>. "The Laptop of Dechert LLP's investigator, Del Rosso, discovered in January 2023, <u>has caused new and ongoing injury to El Omari beginning in January 2023</u>. To date, El Omari's damages are in excess of tens of thousands of dollars paid to date in legal fees and costs, and forensic computer investigation costs related to investigating, assessing the scope of the hacking, and seeking to remedy the complete loss of the confidentiality of the emails." [emphasis added] Compl., ¶ 41 (A-26)

As to other, non-forensic computer investigation costs plead, Magistrate Wang again misread the plain language of the complaint, and too narrowly applied *Van Buren* to bar their recovery. "The Complaint goes on to describe, in general and conclusory language, that Plaintiff suffered the "complete loss of valuable

confidentiality . . . in the attorney-client communication emails pertaining to El Omari's NY litigation" (*id*. at ¶ 43), and, incoherently, "spending attorney fees and costs seeking to stop the use, dissemination of, and to restore the confidentiality of the emails on the [Del Rosso] Laptop from the Defendants." *Id*. at 42." Report, pp. 18-19 (A-55-A-56). Magistrate Wang concludes "[t]he technological harm here was the apparent malware installation on Plaintiff's computer systems, and the Complaint does not sufficiently allege that the costs Plaintiff suffered were "from efforts to identify, diagnose, or address [that] damage." (El Omari II, ECF 95 at 44). Instead, he has continued to include the "value" of the confidentiality of Plaintiff's 2017 emails and efforts (including litigation) to "restore the confidentiality"[25] of the emails in his pleading of loss. These are not compensable under the plain language of the statute and *Van Buren*.[26]

> [25] It is further unclear what Plaintiff means when he seeks to "restore" confidentiality of the emails that were copied. The emails were disseminated to many, and that bell cannot be unrung. Restoring the security of his email accounts might have included changing passwords and other security measures after he clicked on the link, but it would be unreasonable to read the statute to mean that. In the 7 years since that incident, Plaintiff and his counsel (as well as counsel for defendants) have received emails from an anonymous "KB" who claims that all of Plaintiff's and his counsel's email accounts have been compromised. (*See* ECF 57-6). If that is true, then the destruction of emails on the Del Rosso Laptop would have no effect on "restoring confidentiality" of any communications that had been copied and disseminated since 2017. [emphasis added]

> [26] Plaintiff quotes from *Van Buren*'s dicta about technological loss, and omits the last sentence, which makes clear that the "loss of

privilege of" Plaintiff's emails is not recoverable damage. *Van Buren* examined whether a police officer could be held criminally liable for using information from a law enforcement database for a personal (and hence improper) purpose. In holding that he could not, the Supreme Court noted that the statute's definitions of "damage" and "loss" focused on technological harms from the hacking itself (the quoted language in Plaintiff's brief), to then say, "<u>[t]he term's definitions are ill fitted, however, to remediating 'misuse' of sensitive information that employees may permissibly access from their computers. Van Buren's situation is illustrative: His run of the license plate did not impair the 'integrity or availability' of data, nor did it otherwise harm the database system itself.</u>" 141 S. Ct. at 1660 (internal citations omitted)." [emphasis added]

Report, pp. 19-20 (A-56-A-57)

There is nothing incoherent in the pleading. Magistrate Wang's footnotes are important and are mistaken in fact and reasoning. Footnote 25 of the Report questions El Omari's use of the word "restore" in damage paragraph 42 of the complaint, and reads things into the complaint that are not there. That paragraph reads "… monetary expenses of investigating the hacking and spending attorney fees and costs seeking to stop the use, dissemination of, and to <u>restore</u> the confidentiality of the emails on the Laptop from the Defendants." [emphasis added] Compl., ¶ 42 (A-26-A-27)

Magistrate Wang is wrong and her analogy does not apply here, when she says, "The emails were disseminated to many, and that bell cannot be unrung." Report, p. 19, fn. 25 (A-56). The complaint does not state that the hacked emails "were disseminated to many" which implies a public release, although there may

35

be "many" within the circle of the Dechert law firm. Aside from the hacker in

CyberRoot, the complaint states one known person had access to the hacked

emails, Del Rosso, Dechert's private investigator, on his Laptop, and the

information from the emails were <u>disseminated to Dechert</u>. This is a discrete

number, identifiable, containable, and destroyable. "Confidential and privileged

email communications between El Omari and his undersigned attorney were

copied from El Omari's email account and disseminated for use [by Dechert]

against him in the NY litigation… it is presently unknown how many other copies

of the illegal email tranche may exist and who possesses them. These law emails

would contain confidential information, such as El Omari's legal strategy,

witnesses, evidence, and funding about the NY litigation defended by Dechert

LLC." Compl., ¶ 30 (A-21-A-22) Persons within Dechert who would have had

access or information from the stolen emails would be Linda Goldstein at Dechert

NY who defended against El Omari, and any other Dechert counsel of record or

staffer who worked on the cases. Compl., ¶ 9 (A-14)

    The only known copy of the stolen email tranche, itself an update copy, was

on Del Rosso's Laptop, and as such there are likely to be other copies, or

information about the email tranche in reports or other form by Del Rosso, within

Dechert's circle. "The timing of the Laptop manufacturing date which predates the

emails contained thereon indicates that the illegal email tranche in

"update24Jan.rar" on the Laptop was copied from another source in 2019 or later and is itself a copy." Compl., ¶ 20 (A-18) Thus there is one finite known person and place, Del Rosso's Laptop, which can be contained, isolated and the email tranche ultimately destroyed. This "restores" the confidentiality of this stolen email tranche. The same identification, containment, isolation and destruction can be done in the event other copies of or information about the email tranche are found to exist by Del Rosso or in the Dechert law firm. This "restores" confidentiality. El Omari's remedy plea in the complaint includes this relief. "Ordering that, after issuance of a final, non-appealable judgment in this action and then only with the express permission of this Court of Plaintiff, Defendants to destroy all the information obtained from Plaintiff as a result of the alleged wrongdoing in their possession, custody or control." Compl., Relief, ¶ D (A-37)

Magistrate Wang's footnote 26 in the Report shows she misapplied the damage limitations in *Van Buren*. Magistrate Wang concluded that Plaintiff's argument that the requested relief is permitted by *Van Buren* is undercut by a subsequent sentence in the opinion. "Plaintiff quotes from *Van Buren*'s dicta about technological loss, and omits the last sentence, which makes clear that the "loss of privilege of" Plaintiff's emails is not recoverable damage." Report, p. 20, fn. 26 (A-57). El Omari argued that "The aforementioned stealing of data, or a data breach, and El Omari's remedial efforts to determine the extent of the data loss,

retrieve and preserve their confidentiality, is a covered "cost of responding to an offense," a typical consequence of hacking, within *Van Buren. See* 18 U.S.C. § 1030(e)(8)." Pls MOL, p. 23.

But Magistrate Wang quotation of the next sentence in *Van Buren* does not apply as she reasons, "[t]he term's definitions are ill fitted, however, to remediating 'misuse' of sensitive information that employees may permissibly access from their computers. Van Buren's situation is illustrative: His run of the license plate did not impair the 'integrity or availability' of data, nor did it otherwise harm the database system itself." 141 S. Ct. at 1660 (internal citations omitted)." Report, p. 20, fn. 26 (A-57).

In relying on this language, Magistrate Wang erroneously concludes that El Omari's damages involve seeking to remediate the "misuse" of the stolen attorney-client communication emails. Well, the Defendants' "misuse" of the stolen data in past litigation is indeed a bell that cannot be unrung, but restoring the confidentiality of the stolen data can be since there is alleged a finite circle within which the stolen data exists and can be identified, contained, and destroyed.

The difference is in the facts, Van Buren accessed a database and did not "impair the 'integrity or availability' of data, nor did it otherwise harm the database system itself." Here, Magistrate Wang correctly concluded El Omari's database <u>was</u> harmed by the malware. "Plaintiff alleges sufficient facts that he was

hacked by someone…." Report, p. 16 (A-53). The harm from the malware and the newly identified copy of the stolen email tranche on Del Rosso's Laptop, is the direct link to "El Omari's remedial efforts to determine the extent of the data loss, retrieve and preserve their confidentiality, and is a covered "cost of responding to an offense," a typical consequence of hacking, within *Van Buren. See* 18 U.S.C. § 1030(e)(8)." Pls MOL, p. 23.

## D. CONVERSION OF EL OMARI'S EMAILS WAS PROPERLY PLEAD WITHIN THE 3-YEAR STATUTE OF LIMITATIONS UNDER NORTH CAROLINA LAW

### Count Three: Conversion

Lastly, Magistrate Wang erred in concluding that "Count Three – conversion under North Carolina law – is both time barred and fails to state a claim." Report, p. 20 (A-57).

Magistrate Wang erred in application of the North Carolina 3-year statute of limitations in concluding "the discovery rule does not apply to conversion claims under North Carolina law, and the "hack" occurred in January 2017." *Id*.

But Magistrate Wang did not review or consider El Omari's argument, that the statute of limitations did not even begin to run until January 2023 because all the statute's elements had not been met until that point. This is an argument not involving the discovery rule. "The § 1-52(4) clock did not start running until January 13, 2023. Although the hacking occurred in 2017, the "dominion" over the

subject emails on the Laptop was of a hidden and secret nature. The "exclusion" of El Omari's rights to the subject emails on the Laptop never occurred until he knew by the notice from the U.K. litigation they were on the Laptop on January 13, 2023. Compl. ¶ 19 (A-17) El Omari could not be excluded from the subject emails if he didn't know they were on the Laptop. On that date, January 13, 2023, El Omari began to be excluded from the subject emails on the Laptop, and all the elements of conversion were met on that date." Pls MOL, p. 12. El Omari's emails were still on the Laptop and he was excluded from them when he filed this action.

Even if Magistrate Wang was correct in assuming that all the elements were met on the hack date in 2017, which she is not, she did not consider the hacking and collection of El Omari's emails was ongoing and extended to May 2021, which is within the 3 years statute of limitations since the complaint was filed on June 1, 2023. Therefore, there is a valid cause of action for all hacked emails with dates after June 1, 2020. "The data on the Laptop, determined to be between March 2011 and May 2021, is during the period leading up to El Omari's RAKFTZA employment termination in 2012 and subsequent NY litigation from 2016 onward." Compl., ¶ 20 (A-18)

Magistrate Wang also did not consider application of the discovery rule under more recent case law. Report, p. 20 (A-57). See, Pls. MOL, p. 13. "However, the entire principle upon which defendants' argument hinges, which is that the

statute of limitations begins to run against a plaintiff who has no way of knowing that the underlying breach has occurred, runs afoul of both our recent decisions, such as *Christenbury*, and basic notions of fairness. *Chisum v. Campagna*, 855 S.E.2d 173, 188-89 (N.C. 2021).

As pointed out above, Magistrate Wang also misapplied estoppel. See also, Pls. MOL, p. 13.

Magistrate Wang also erred in application of the elements of the North Carolina conversion law in concluding that emails cannot be converted. "Plaintiff has not sufficiently pleaded that a conversion occurred." Report, p. 20 (A-57). "The North Carolina Supreme Court has defined the tort of conversion as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Services, LLC*, 365 N.C. 520, 523 (N.C. 2012) (internal citation omitted). Emails are neither goods nor personal chattels, and Plaintiff's use of his email account apparently continued unimpeded." *Id.* (Magistrate Wang included a footnote in this sentence citing *Van Buren*, but *Van Buren* did not purport to interpret North Carolina conversion law or its elements.)

But Magistrate Wang did not review or consider El Omari's federal case law that <u>denial or violation of the plaintiff's dominion over or rights in property </u>is an

41

act of conversion. ""Under North Carolina law, "'[c]onversion is defined as: (1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; (4) to the exclusion of the rights of the true owners."" *TSC Research, LLC v. Bayer Chemicals Corp.*, 552 F.Supp.2d 534, 542 (M.D.N.C. 2008) (quoting *Eley*, 171 N.C. App. at 371). North Carolina law allows a claim for conversion to be premised on something other than *just* the denial of the rights to the property. "'[T]he general rule is that there is no conversion until some act is done which is a denial *or violation of the plaintiff's dominion over or rights in the property*.' Thus, Defendants' conduct did not need to completely deprive Plaintiff['s] use and access to its computer files as Magistrate Wang reasoned. It would be sufficient if Defendants' conduct violated Plaintiff's dominion or control over the property (here, the computer files), or if Defendants altered the condition of Plaintiff's rights to those computer files." (internal citations omitted) (emphasis in original). *Bridgetree, Inc. v. Red F Marketing LLC, et al*, No. 3:10-CV-00228-FDW-DSC, Doc. No. 253, at 26 (W.D.N.C. Feb. 5, 2013). Here, El Omari's exclusive and confidential rights—i.e., dominion over and rights—in his hacked email communications, has been lost. This constitutes a "denial *or violation of the plaintiff's dominion over or rights in the property*" and a properly plead conversion claim. " Pls. MOL, p. 16.

**E. EL OMARI SHOULD HAVE BEEN GIVEN AN OPPORTUNITY TO AMEND THE COMPLAINT IF NECESSARY**

In the event that Magistrate Wang's recommendation was accepted, which it should not have been, El Omari respectfully requested in the lower court in his objections an opportunity to amend the complaint under Fed. R. Civ. P. 15(a)(2) to cure any pleading defects. El Omari had not previously requested, nor had there previously been any amendments to the complaint. Pls Objections, ECF 77 (A-85) Magistrate Wang did not discuss or make any recommendation. Judge Kaplan did not discuss or make a ruling on this request. El Omari's request should have been granted.

### III. CONCLUSION

For the Foregoing Reasons, Judge Kaplan erred by not reviewing Magistrate Wang's Report and Recommendation *de novo* and her recommendation for dismissal was reversable error under a *de novo* review. Moreover, even if her recommendation was correct, which it was not, El Omari should have been given an opportunity to amend the Complaint.

### IV. RELIEF

For The Foregoing Reasons, Plaintiff-Appellant Oussama El Omari respectfully requests this Honorable Court to Reverse the Dismissal of this Action as against the Appellees, and Remand this action for further proceedings. In the event the dismissal is otherwise upheld, which it should not be, Plaintiff-Appellant

respectfully requests the case be remanded for an opportunity to amend the

complaint.

Dated:  New York, New York
        November 4, 2024


                                    Respectfully submitted,

                                    MOORE INTERNATIONAL LAW PLLC

                                    By:    */s/ Scott M. Moore*
                                    _____
                                    Scott M. Moore, Esq.
                                    *Attorneys for Plaintiff-Appellant*
                                    45 Rockefeller Plaza, 20th Floor
                                    New York, NY  10111
                                    (212) 332-3474

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with U.S. Court of Appeals for the Second Circuit Local Rule 32.1(a)(4)(A) which requires that the principal brief contain no more than 14,000 words, because it contains 10,478 words, exclusive of the sections that do not count towards the limitation pursuant to Fed. R. App. P. 32(a)(7)(B). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman font size 14.

Dated: November 4, 2024

*/s/ Scott M. Moore*

_____

MOORE INTERNATIONAL LAW PLLC
*Attorneys for Plaintiff-Appellant*
45 Rockefeller Plaza, 20th Floor
New York, NY 10111
(212) 332-3474